OPINION
{¶ 1} This is an appeal from a Partial Summary Judgment in favor of the Defendants that was subsequently rendered a final appealable order as a consequence of the settlement and satisfaction of the remaining claims in the case
 {¶ 2} Appellants raises four Assignments of Error:
 ASSIGNMENTS OF ERROR {¶ 3} "I. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE DEFENDANTS-APPELLEES ON THE ISSUE OF BREACH OF CONTRACT.
 {¶ 4} "II. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE DEFENDANTS-APPELLEES ON THE ISSUE OF FRAUD.
 {¶ 5} "III. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE DEFENDANTS-APPELLEES ON THE ISSUE OF UNJUST ENRICHMENT.
 {¶ 6} "IV. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE DEFENDANTS-APPELLEES ON THE ISSUE OF NEGLIGENT MISREPRESENTATION."
 I, II, III, IV. {¶ 7} The claims of the First and Second Assignment of Error are inextricably bound together and we consider them in tandem.
 {¶ 8} We find Assignments of Error One and Two well-taken, Assignments of Error Three and Four without merit, and reverse and remand. Our reasons follow.
 {¶ 9} The genesis of this case is a commercial real estate brokerage contract between Realty Executives Commitment and Jacqueline G. Cassel executed on March 24, 1998, listing "vacant land" and "land and building at 26th St." and referencing a Map identified as "Exhibit A." The contractual period of the listing was March 24, 1998, to March 23, 1999.
 {¶ 10} A commission is earned when:
 {¶ 11} (1) "a binding contract for sale or exchange has been executed and/or when REALTOR has produced a Purchaser, ready, willing, and able to buy the real Estate pursuant to the terms of the Contract,
 {¶ 12} (2) "when the property is sold during the listing period,
 {¶ 13} (3) "when a `contract, trade, exchange or lease is signed before this Contract expires' the commission will be earned upon the "final disposition of the contract.
 {¶ 14} (4) "The property is sold during the `protection period' of 180 days from the termination of the contract to any `person[s] to whom a broker or agent shall have offered the same during the term of this Contract"[with an exception not here relevant].
 {¶ 15} On February 25, 1999, a sales agreement was executed between Appellee, Jacqueline L. Cassel, and Vienna Woods Townhomes Limited Partnership, an Ohio Limited Partnership (LLP), (Townhomes) for the sale of 20 acres for $600,000. The agreement also provided for the execution of an escrow transfer back. The purpose of this escrow was to allow the purchaser the opportunity to obtain Federal tax credits as a subsidy for development of low income housing, while securing to the seller the title to the property in the event the project did not go forward.
 {¶ 16} This agreement also contained an option to purchase 20 acres (Phase II), identified by the parties as "option acreage," at the rate of $30,000 per acre, in consideration of $20,000 paid by the purchaser. This option was for a period of one year from the date the first 20 acres was transferred.
 {¶ 17} The agreement also addressed the issue of utility access to Phase I across the property identified in the option, Phase II, and provided:
 {¶ 18} "Seller and Purchaser covenant and agree that the location and the cost of such utility lines shall be agreed upon by both Seller and Purchaser prior to the installation of such lines."
 {¶ 19} Because Phase I development required utility lines coming in across Phase II property, the parties agreed that Townhomes would develop the utilities and the cost would be adjusted contingent upon the exercise of option to purchase Phase II.
 {¶ 20} The parties then executed an amendment to the sales agreement on October 22, 1999, particularizing the precise acreage in Phase I (21.5 acres per survey), and extending the option to purchase the "option acreage" until November 1, 2000. As to the utility installations, the Seller executed a $132,946.00 note secured by mortgage to Townhomes as a set aside in event the option was not exercised. This amount was not included in the sale price for which the brokerage commission was paid.
 {¶ 21} On October 29, 1999, the parties closed the sale on the primary (non-option) property. The acreage therein was 22.842 acres. The commission was paid upon this purchase.
 {¶ 22} Vienna Woods Townhomes Limited Partnership, per se, never did exercise the option to purchase Phase II, or the "option acreage."
 {¶ 23} W.O. Brisben Companies North, Inc., (Brisben) was a general partner in Vienna Woods Townhomes Limited Partnership. Brisben formed a new limited partnership with other partners named Vienna Woods II Limited Partnership (V.W.II). V.W. II negotiated directly with the owner, Cassel, for the purchase of the property identified in Phase II of the earlier contract. Thereafter, on February 28, 2000, by quit claim deed recorded March 1, 2000, Townhomes and Cassel quit claimed their interests in the "option acreage, a total of 23.309 acres to Vienna Woods II (V.W. II). Instr. #200003010011738, Stark County Recorder. On the same date, February 28, 2000, filed March 1, 2000, Instr. #200003100011739, Stark County Recorder, V.W. II delivered a limited warranty deed back to Cassel, all in anticipation of the procurement of tax credits toward the development of the property. There was no monetary consideration paid at the time of these transfers and transfers back. Therefore, consistent with the early practice between the broker and the seller, no commission was paid or deemed payable.
 {¶ 24} Efforts to complete and close this transaction were to no avail. Another Purchase Agreement was executed between Cassel and V.W. II on November 20, 2002, resulting in a re-deeding of the tract to Cassel by quit claim deed, March 12, 2003, Instr. #200303120022365, Stark County Recorder, and a re-deeding by Cassel to V.W. II, the same date, Instr. #200303120022366, Stark County Recorder. This property, of smaller acreage, also never closed and no monies were transferred as a consequence.
 {¶ 25} Enter a third limited liability partnership: Vienna Woods Phase II, L.P. (V.W. Phase II).
 {¶ 26} This entity was a composite of SunAmerica Housing Fund 1152 (SunAmerica) and MBS GP Vienna II, L.L.C. (MBS). It is with this entity, and its purchase of a portion of the original option property, the "option acreage," that the litigation now focuses.
 {¶ 27} On October 3, 2003, Vienna Woods II conveyed a 16 acre tract to Vienna Woods Phase II, L.P., Instr. #200310030096170. It is undisputed that the grantor received no consideration in the transfer and the proceeds were delivered to Appellee, Cassel.
 {¶ 28} The fact that the transfer in question came from Vienna Woods Phase II, and not Cassel, allows an inference of "continuation" favoring the Plaintiffs' claims.
 {¶ 29} The trial court favored us with a carefully considered 13 page summary judgment decision. In it, the court identified the operative facts of the dispute, analyzed each of the claims of the Plaintiffs-Appellants, identified the appropriate rule and case law relative to summary judgment consideration, and concluded that "there are no genuine issues of material fact with respect to all of the Plaintiffs' claims against the Cassels . . . (and) Cassels are entitled to summary judgment in their favor as a matter of law . . ."
 {¶ 30} The lynchpin of Appellant's claims now is succinct:
 {¶ 31} Appellees convinced the Judge in the trial court that they sold Phase II of the real estate to a completely different entity (Vienna Woods Phase II, L.P.) outside of the term of the Listing Contract and owed no additional real estate commissions. Therefore, Appellants are before this Court asking for the opportunity to present their case before a trier of fact to decide whether or not Vienna Woods Townhomes Limited Partnership, Vienna Woods II Limited Partnership and Vienna Woods Phase II, L.P. functioned as one entity and whether or not this was one continuous transaction necessitating the payment of $69,927.00 in remaining real estate commissions to Appellants per the Listing Contract. (Appellants' Brief, p. 6-7).
 {¶ 32} Our appellate review of summary judgment is de novo. We independently are called to examine the pleadings and evidentiary supplications enumerated in Civ.R. 56(C) and determine whether reasonable minds could come to but one conclusion, and that conclusion is adverse to Appellants; Appellants being entitled to have the supplications construed most strongly in their favor.
 {¶ 33} Pursuant to Civ.R. 56(C), the party seeking summary judgment must prove that 1) there is no genuine issue of material fact; 2) they are entitled to judgment as a matter of law; and 3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. Dresher v. Burt (1996), 75 Ohio St.3d 280.Siemientkowski v. State Auto Mut. Ins. Co., 2006-Ohio-4122.
 {¶ 34} In this case, there are genuine issues of fact surrounding the question of whether the subsequent partnerships that were formed and dealt with the Seller were distinct, independent and not acting either in an attempt to commit a fraud upon the Plaintiffs or were acting as the alter ego of the purchaser of Phase 1: Townhomes. The Defendant, owner, herself testified that she thought throughout these transactions that she was dealing with the same entity. There are congruent stakeholders in the partnership. The failure of Townhomes to claim the credit of $108,230.89 for which they would be entitled is another indicia of concert or alter ego. The admitted fact that Cassel transferred part of the land in question to Vienna Woods II at a time when Townhomes had a viable option to purchase the same land allows an inference of unity between the partnerships. Thus, construing the evidence most favorably to the non-moving party (Plaintiff); we conclude that there are genuine issues of fact.
 {¶ 35} More critical is whether these genuinely disputed facts were also "material" within the requirement of Civ.R. 56(C). We conclude that a proper way to determine this question is to assume, for the purpose of analysis, that each of the successive limited partnerships were the same. If that were so, would the activities of the parties generate compliance with the listing contract and a commission obligation? Thus, if the successive contract-parties were Townhomes Limited Partnership instead of Vienna Woods II Limited Partnership and/or Vienna Woods Phase II, would Cassel have been obligated to pay a commission? If the answer is "no", then it is patent that the summary judgment granted by the trial court is correct, and we should affirm the judgment. On the other hand, if the answer is "yes", neither the trial court nor this court should grant summary judgment, and the case must be reversed and remanded for jury determination on the fraud, alter ego, and final disposition issues.
 {¶ 36} As we have noted, there are three circumstances under which Appellants are entitled to commission on the sale or exchange. All are encompassed within paragraph 13 of the March 24, 1998, contract between Plaintiffs and Defendant Cassel.
 {¶ 37} The terms provide:
 {¶ 38} "A. TERM OF AGENCY: Owner agreed that REALTOR shall have the exclusive right to sell, trade, exchange or lease the Real Estate . . . on 3/24/1998 until 6:00 p.m., Stark County, Ohio time on 3/23, 1999, and REALTOR shall be entitled to its commission if the Real Estate is purchased, traded, exchanged or leased by REALTOR or by Owner or by any other person at a price or terms acceptable to the Owner, during the existence of this Contract.
 {¶ 39} "B. EXTENSION: If a contract to purchase, trade, exchange or lease is signed before this Contract expires, the term hereof shall continue until final disposition of the Contract to purchase, trade, exchange or lease.
 {¶ 40} "C. PROTECTION PERIOD: The purchase, trade, exchange, or lease of the Real Estate without the agency or a broker, to any person(s) to whom a broker or agent shall have offered the same during the term of this Contract, if such Contract of purchase, trade, exchange, or lease is executed within 180 days from the termination of this Contract, shall be considered a purchase affected by Broker and shall entitle Broker to the Commission herein agreed to be paid by Owner provided Owner has received notice in writing, including the names of prospective purchasers before or upon expiration of this listing Contract (or any extension thereof). Except as hereinafter provided, however, Owner shall not be obligated to pay the fee if Owner enters into a written exclusive Right to Sell Agreement with another licensed Real Estate Broker within the protection period."
 {¶ 41} The matter of contract interpretation is a question of law to be determined by the court.
 {¶ 42} It is beyond dispute that the parties to the brokerage contract understood that the unique manipulation of title transfers — designed to allow the potential buyer the advantage of tax credits only available to an "owner"-did not, at that time, generate performance of the brokerage contract so as to generate the agreed fee. Thus it follows that the February 28, 2000, transfer of V.W.II did not, per se, constitute compliance with Sec. 13 (B) [EXTENSION], and generate, at that time, an obligation to pay a brokerage fee.[1]
 {¶ 43} The brokerage fee became due and payable, if at all, only upon the transfer of purchase money consideration to the seller, Cassel.
 {¶ 44} As to the property in question, Phase II or Option property, the sales agreement, covering 23.309 acres, was executed on February 28, 2000, within the term and reach of the extended option, and "putative title" was transferred to V.W.II on March 1, 2000, in order that V.W.II could process application for federal tax credits. This transaction was not completed, in the sense that the final settlement of title and payment of purchase price did not occur.
 {¶ 45} Our analysis leads us to conclude that even if the February 28, 2000, transferee had been Townhomes instead of the new partnership, V.W.II, there was no "final disposition of the contract to purchase, trade, exchange or lease" within the reach of Sec. 13(B) of the brokerage agreement.
 {¶ 46} Three years later, on October 3, 2003, V.W.II deeded a 16 acre portion of Phase II realty to Vienna Woods Phase II, L.P. Instr. #200310030096170, Stark County Recorders Office. It is undisputed that V.W.II received no consideration for the transfer and the proceeds of the sale were delivered to Appellee, Cassel.
 {¶ 47} Appellants argue that, inasmuch as the different partnerships were really the same, and V.W.II and Phase II were merely alter egos of Townhomes, the various transactions, culminating in the eventual delivery of purchase money to Cassel on October 3, 2003, was a continuous transaction and is, therefore, a "final disposition of the Contract to purchase, trade, exchange or lease" within the reach of Section 13(B) of the brokerage contract.
 {¶ 48} Although the ties to the terms of the brokerage contract are increasingly tenuous, we believe that such contract could apply to the much later transfer and payment of consideration in 2003, provided both V.W.II and Vienna Woods Phase II are found to be the alter ego of Townhomes.
 {¶ 49} Thus, we conclude that there are genuine issues of material fact, and that summary judgment is inappropriate.
 {¶ 50} The issues extant for factual determination (jury questions) are:
 {¶ 51} 1. Was Vienna Woods II, Limited Partnership created and functioning as the alter ego of Vienna Woods Townhomes Limited Partnership, in their dealings with Jacqueline Cassel, and others?
 {¶ 52} 2. Was Vienna Woods Phase II, L.P. created and functioning as the alter ego of Vienna Woods Townhomes Limited Partnership, in their dealings with Jacqueline Cassel, and others?
 {¶ 53} 3. Was the sale of the 16 acre tract to Vienna Woods Phase II, L.P. a part of a continuous transaction and a final disposition of property included in the original brokerage agreement?
 {¶ 54} If the answer to Question 1 is "no," analysis ends and the Defendant-Appellees are entitled to judgment.
 {¶ 55} If the answer to Question 1 is "yes," the fact finder must then consider Question 2. If the answer to Question 2 is "no," analysis ends and the Defendant-Appellees are entitled to judgment.
 {¶ 56} If the answers to Questions 1 and 2 are "yes," the fact finder must then consider Question #3.
 {¶ 57} Appropriate instructions on the issues of damages await another day.
 {¶ 58} THE FIRST AND SECOND ASSIGNMENTS OF ERROR ARE SUSTAINED, AND THE SUMMARY JUDGMENT AS TO COUNTS ONE AND TWO OF THE STARK COUNTY COURT OF COMMON PLEAS IS REVERSED. THE CAUSE IS REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION AND THE LAW.
 {¶ 59} COUNTS THREE, FOUR, AND FIVE ARE PATENTLY WITHOUT MERIT, AND THE SUMMARY JUDGMENT AS THESE COUNTS IS SUSTAINED.
Milligan, J. Ret., Boggins, P.J. and Reader, J. Ret., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed in part, reversed in part and remanded to the trial court for further proceedings consistent with this Opinion and the law.
Costs assessed to Appellees.
[1] Both in an earlier transaction, where putative title was transferred in an abortive effort to procure federal tax credit, and in the instant dealings between Cassel and Townhomes, where the fee was not paid until the monetary consideration was paid, neither party made any claim that the fee was due upon the transfers incident to the effort to obtain tax credits.